IN THE
COURT OF SPECIAL APPEALS OF MARYLAND

SEPTEMBER TERM, 2006

NO. 2483

BRIAN CHRISTOPHER COOPER,

Appellant

v.

STATE OF MARYLAND,

Appellee

APPEAL FROM THE CIRCUIT COURT FOR BALTIMORE CITY
(THE HONORABLE M. BROOKE MURDOCK PRESIDING WITH A JURY)

APPELLANT'S BRIEF

NANCY S. FORSTER
Public Defender

MARTHA WEISHEIT
Assistant Public Defender

Office of the Public Defender
Appellate Division
6 Saint Paul Street, Suite 1302
Baltimore, Maryland 21202-1608
(410) 767-8535

Counsel for Appellant

CRIMINAL APPEALS DIVISION
RECEIVED

OCT 24 2006

# INDEX

---

## TABLE OF CONTENTS

## APPELLANT'S BRIEF

**Page**

STATEMENT OF THE CASE..................................................................1

QUESTIONS PRESENTED...................................................................2

STATEMENT OF FACTS ....................................................................2

ARGUMENT ...................................................................................8

I.     THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT COULD RETURN INCONSISTENT VERDICTS. ................................................................... 8

II.    THE JUDGMENT IN THIS CASE SHOULD BE REVERSED WHERE THE VERDICTS WERE INCONSISTENT, DEFENSE COUNSEL OBJECTED TO AN INSTRUCTION CONDONING THE INCONSISTENT VERDICTS, AND THE COURT OF APPEALS DECISION IN *PRICE V. STATE* WAS ISSUED AFTER THE TRIAL, BUT WHILE THIS APPEAL WAS PENDING. ............................. 15

III.   THE TRIAL COURT ERRED IN ADMITTING AS SUBSTANTIVE EVIDENCE PRIOR STATEMENTS OF A CRITICAL STATE'S WITNESS WHICH DID NOT, IN SUBSTANCE, CONTRADICT THE WITNESS'S TRIAL TESTIMONY. ............................................................. 18

IV.    IT WAS ERROR TO REFUSE TO ADMIT THE PRIOR STATEMENTS IN THEIR ENTIRETY UNDER THE "DOCTRINE OF VERBAL COMPLETENESS."........................... 28

V.     A SUSPECT'S FAILURE TO·TURN HIMSELF IN TO THE POLICE IS NOT ADMISSIBLE AS CONSCIOUSNESS OF GUILT. ................................................................................... 31

CONCLUSION ................................................................................34

## TABLE OF CITATIONS

                                                                           **Page**

*Cases*

*Case v. State*, 118 Md. App. 279, 702 A.2d 177 (1997).......................................... 30

·*Churchfield v. State*, 137 Md. App. 668, 774 A.2d 409 (2001).............................. 30

*Conyers v. State*, 345 Md. 525, 693 A.2d 781 (1997) ...................................... 29, 30

*Corbett v. State*, 130 Md. App. 408, 746 A.2d 954 (2000) ................................... 27

*Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932). ................................................................................. 12

*Feigley v. Balto. Transit Co.*, 211 Md. 1, 124 A.2d 822 (1940)............................. 29

*Franklin v. State*, 319 Md. 116, 571 A.2d 1208 (1990)......................................... 17

*Galloway v. State*, 371 Md. 379,·809 A.2d 653 (2002) ..................................... 9, 15

*Hays v. State*, 240 Md. 482, 214 A.2d 573 (1965) .................................... 16, 17, 18

*Holmes v̇. State*, 116 Md. App. 546, 698 A.2d 1139 (1997) ................................... 30

*Mack v. State*, 300 Md. 583, 601, 479 A.2d 1344 (1984)......................................... 9

*Makell v. State*, 104 Md. App. 334, 656 A.2d 348 (1995)...................................... 27

*Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) ...................................................................................... 18

*Nance and Hardy v. State*, 331 Md. 549, 629 A.2d 633 (1993) ............................. 26

*Price v. State*, 405 Md. 10, 949 A.2d 619 (2008) .................................. 2, 10, 15, 16

*Rutherford v. State*, 160 Md. App. 311,  863 A.2d 1031 (2004) ........................... 30

*Schowgurow v. State*, 240 Md. 121, 213 A.2d 475 (1965) ..................................... 16

*Shell v. State*, 307 Md. 46, 54, 512 A.2d 358 (1986).............................................. 9

*Southern Management v. Taha*, 378 Md. 461,  836 A.2d 627 (2003) ..................... 9

*Squire v. State*, 280 Md. 132, 358 A.2d 1019 (1977) ............................................ 17

*State v. Williams*, 397 Md. 172, 916 A.2d 294 (2007) .......................................... 14

*Tyler v. State*, 342 Md. 766, 679 A.2d 1127 (1996) .............................................. 27

*United States v. Beahm*, 664 F.2d 414 (4th Cir. 1981) .......................................... 33

*United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976) ............................................ 32

*United States v. Powell*, 469 U.S. 57,
    105 S.Ct. 471, 83 L.Ed.2d 461 (1984) .............................................................. 12

*United States v. Thompson*, 82 F.3d 849,  (9th cir. 1996) ...................................... 33

*Whitaker v. United States*, 617 A.2d 499 (D.C, 1992) ............................... 10, 12, 13

*Wright v. State*, 307 Md. 552, 576, 515 A.2d 1157 (1986) ...................................... 9

### Rules

Maryland Rule 5-106 ........................................................................................... 30

Maryland Rule 5-802.1 ....................................................................................... 25

### Miscellaneous

C. McCormack, *The Turncoat Witness, Previous Statements as Substantive
    Evidence,*
    25 Tex. L. Rev. 573, 577 (1947).................................................................... 26

IN THE
COURT OF SPECIAL APPEALS OF MARYLAND

SEPTEMBER TERM, 2006

NO. 2483

BRIAN CHRISTOPHER COOPER,

Appellant

v.

STATE OF MARYLAND,

Appellee

APPEAL FROM THE CIRCUIT COURT FOR BALTIMORE CITY
(THE HONORABLE M. BROOKE MURDOCK PRESIDING WITH A
JURY)

APPELLANT'S BRIEF

## STATEMENT OF THE CASE

The Appellant, Brian Christopher Cooper, was charged in Baltimore City with first degree murder, carrying a concealed deadly and dangerous weapon, and carrying a deadly and dangerous weapon openly with intent to injure. On November 8, 2006, trial by jury commenced in the Baltimore City Circuit court, the Honorable M. Brooke Murdock presiding. It concluded on November 13,

2006, when the jury returned a guilty verdict on the first degree murder charge and not guilty verdicts on both weapons charges. Following the trial, a life sentence was imposed.[1]

## QUESTIONS PRESENTED

1.     Did the trial court err in instructing the jury that it could return inconsistent verdicts?

2.     Should the judgment in this case be reversed where the verdicts were inconsistent, defense counsel objected to an instruction condoning the inconsistent verdicts, and the Court of Appeals decision in Price v. State[2] was issued after the trial, but while this appeal was pending?

3.     Did the trial court err in admitting as substantive evidence prior statements of a critical state's witness which did not, in substance, contradict the witness's trial testimony?

4.     Was it error to refuse to admit the prior statements in their entirety under the "doctrine of verbal completeness?"

5.     Is a suspect's failure to turn himself in to the police admissible as evidence of consciousness of guilt?

## STATEMENT OF FACTS

LeShara Scott, who was the sister of Elliott Scott, the victim in this case, testified that on April 16, 2002, at around 11;45 p.m. she heard the sounds of fighting on the back porch and recognized her brother's voice. [T2: 17-20][3] She

---

[1] The Appellant had been previously tried and convicted of all charges on April 28, 2003, but those convictions were reversed on appeal, and a new trial was granted.

[2] 405 Md. 10, 949 A.2d 619 (2008)

[3] Transcript references are as follows:

2

went downstairs and unlocked the back door to let her brother into the house and that there was a hole in his shirt. When her brother the shirt off, she could see that he had been stabbed three times. Ms. Scott called for her mother to come downstairs, and after her mother dialed 911, her brother was taken to Shock Trauma. [T2: 22-28]

When asked about events that preceded the stabbing, she recalled that her brother had come home from work around 7:00 or 7:30 p.m., and at around 10:00 p.m. he went outside and sat on the steps with a friend from the neighborhood named Tish. [T: 37] According to Ms. Scott, her brother generally got along well with people and she was unaware that he had any disputes with anyone in particular. [T2: 36]

Fredericka Scott, the victim's mother, testified that on April 16th at around 11:30 p.m. she saw the Appellant sitting on the steps with his friend Tish. Later when she was upstairs in her bedroom she heard a commotion, and after her daughter called her downstairs, she saw that her son, Elliott, had been stabbed. [T2: 49-50] When he took his shirt off, she saw that his injuries were serious and that his internal organs were protruding from one of the stab wounds. [T2: 51-52] After she called 911, her son was taken to Shock Trauma, where he died the following day. [T2: 56-59] According to the testimony of the Medical Examiner,

---

Proceedings of November 8, 2008 -- T1;
Proceedings of November 9, 2006 -- T2;
Proceedings of November 13, 2008 -- T3.

3

the cause of Elliott Scott's death was multiple stab wounds, and the manner of death was homicide. [T3: 65]

Natisha Brown, who described the victim as her neighbor and friend, testified that on April 16th, 2002, she and Elliott Scott, whom she knew as "L.T.,"were "hanging out" on L.T.'s front steps when they decided to walk to a neighborhood liquor store to buy some beer. At that time it was approximately 11:30 p.m. [T2: 66-68] They returned to L.T.'s house, drank the beer, and then returned to the liquor store to get a pint of Jack Daniels. [T2: 69-70] As they were returning to the L.T.'s house, L.T. stopped to talk to some acquaintances at a hack stand. Then while she walked ahead, she heard L.T. engage in a loud and angry exchange with another male. When asked about the nature of that conversation, she testified as follows:

> Q.   Okay, and could you hear what any of these individuals were saying?
>
> A.   Just what's up. LT was like, what's up. As if he was saying hello, like what's up. And the other guy was like, what's up, real aggressively, as in you trying to fight or something. [T2: 75-76]

According to Ms. Brown, the dispute only lasted a few seconds, and then L.T. walked up to her and told her, "All I said was what's up to the nigger." [T2: 73-78] They continued down Fairmount Avenue, and as they turned to go up Fayette Street, a car slowed down, and the passenger engaged in a friendly conversation with L.T. Then another, gold-colored car pulled up next to them, and the person in the passenger seat stuck his head out of the window and said,

4

"What's up?"   [T2: 83-84]   The car came to a stop, and the male on the passenger's side got out, said "What's up," and put his hand in his pocket.   L.T. turned around to look at this person, who at that point was walking towards him, and then L.T. backed up and took off running, with the other male in pursuit.   [T2: 85-86]   Ms. Brown could see that the male pursuing L.T. was close behind him, but she did not see what happened when they got to the end of the street, where there was an alley.   [T2: 87]

Ms. Brown further testified that she did not recognize the individual who got out of the car, but described him as a dark-skinned male of medium build between the ages of 17 and 20 years old.   She stated that she did not get a good look at his face because she was "scared," and thought, when he put his hand on his pocket, that he might be carrying a gun.   [T2: 88-89]   Although she had continued up Fayette Street when this person pursued L.T., she later looked back and saw this same person running towards the gold car.   [T2: 90]   After she returned to L.T.'s house, she heard L.T.'s mother screaming and saw L.T. pacing the dining room, bleeding from his side.   [T2: 90-91]

One of the most important witnesses to testify for the State was Tony Alexander.   He testified that he worked for a hack club" in the area and was familiar with the Appellant because he was a regular customer.   [T2: 151-154]   He also knew L.T.   [T2: 206-207]   On the evening in question, the Appellant had requested Alexander's services, but Alexander had told the Appellant that he was not available.   [T2: 155]   Nevertheless, after he saw the Appellant arguing with

L.T., Alexander agreed to give the Appellant a ride to his grandmother's house. [T2: 159-164] After they arrived there, the Appellant told Alexander to wait while he went inside. [T2: 164-165] Then after the Appellant got back in the car, he told Alexander to take him to the 2600 block of Fayette Street. [T2: 166-167] When they arrived there, the Appellant stopped to talk to some girls, and then told Alexander to take him home. [T2: 168-169] However when they turned right onto Catherine Street, they saw L.T., accompanied by the same girl who had been with him earlier that evening. [T2: 169-170]

According to Alexander, L.T. walked up to the car, so Alexander stopped. Then the Appellant got out of the car, and both men put their hands in their pockets. [T2: 172-173] They stood there for a few seconds, and then L.T. took off running north on Fayette Street with the Appellant in pursuit. [T2: 175] When they turned into an alley, Alexander could no longer see them, and he put his foot on the gas pedal and started to leave. As he pulled off, however, the Appellant came from behind a building and returned to Alexander's car. [T2: 175-179] Alexander estimated that "the whole thing, from his running from the car to the alley and back, [took] I would say, about 15 seconds." [T2: 179] Then Alexander drove the Appellant home. [T2: 180] Alexander estimated that the Appellant had pursued L.T. into the alley sometime between 11:30 and 12:00 midnight. [T2: 180-181]

Later, in the early morning hours after this incident, Alexander saw a police officer in the 2500 block of West Fayette Street, and two or three days later

6

he learned that L.T. had been killed.   He did not contact the police, however. Instead they contacted him, and on April 26th he gave them a taped statement describing the events of April 16th. [T2: 183-185]   Alexander stated that there was one occasion before he gave the statement to Detective Ritz when he saw the Appellant, and at that time he had told the Appellant that he was a suspect in the murder of L.T.  According to Alexander, the Appellant replied that he knew that. [T2: 189-193]

Detective William Ritz, who was assigned to investigate the stabbing, testified that when he reported to the scene he canvassed the area for witnesses and checked the alley behind Elliott Scott's house for evidence.  However he did not find a weapon. [T3: 110-115] He stated that the distance from the mouth of the alley in question to the area behind the victim's house where blood droplets had been observed was 213 feet.   [T3: 123]   Detective Ritz also testified that no weapons or drugs were found in the clothing that Elliott Scott was wearing at the time he was stabbed. [T3: 127-128]

After learning that the victim of the stabbing had died, Detective Ritz attended the autopsy, contacted Tony Alexander, and conducted a search of Alexander's automobile.   However no evidence related to the stabbing was recovered.   [T3: 130-132]   On May 15, 2002, he arrested the Appellant in connection with the homicide. [T3: 132-133]

## ARGUMENT

### I.  THE TRIAL COURT ERRED IN INSTRUCTING THE JURY THAT IT COULD RETURN INCONSISTENT VERDICTS.

At 4:51 p.m. on November 13, 2006, the jury retired for deliberations, and at 5;30 p.m. it sent a question to the court asking whether it could find the accused not guilty on counts three and four (the deadly weapon charges) and find the Appellant guilty under count one. [4]  Over defense counsel's objection, the judge responded that they could.

> THE COURT:   5:30 -- 5:33, We were asked this question, "If we find him not guilty on three and four, but number one hold up a guilty verdict, if we so decide?"  Let's answer the question this way --
>
> MR. MURPHY:   Can I see the question again?  That is the simple answer.  But, I would ask you not to just give that simple answer.
>
> THE COURT:   What would you like to see (unclear)?
>
> MR. MURPHY:   Reinstruct on one, two, three and four or rely on your memory of what I instructed you as to the law.
>
> THE COURT:  Alright, I am going to overrule the defense objection and allow this to go back upstairs.  Thank you. [T3: 230 (corrected version)]

---

[4] In a Motion filed in conjunction with this brief, appellate counsel is requesting that this Court replace the transcript of the proceedings which took place on November 13, 2006, with a revised version.  In the original transcript, there were many inaudibles, and appellate counsel requested that the original recording be enhanced so that a more complete record could be produced for purposes of appeal.  Appellate counsel also requested that the court reporter review the proceedings which took place when the jury returned its question to the court, and is requesting an additional correction of the record with a revised transcript of that part of the trial.

Accordingly fifteen minutes later, at 5:49 p.m., the jury returned its verdicts: guilty of first degree murder and not guilty of carrying a concealed deadly and dangerous weapon and not guilty of carrying a dangerous weapon openly with intent to injure. [T3: 231-232]

It was error to instruct the jury that it could return inconsistent verdicts. Historically in this State as well as many other states and the federal courts, inconsistent verdicts have been tolerated. *Wright v. State*, 307 Md. 552, 576, 515 A.2d 1157 (1986); *Shell v. State*, 307 Md. 46, 54, 512 A.2d 358 (1986); *Mack v. State*, 300 Md. 583, 601, 479 A.2d 1344 (1984)  This was the law at the time Appellant was tried.   Nevertheless on June 9th, 2008, the Court of Appeals announced a new rule of law.  Citing its decision in the civil case of *Southern Management v. Taha*, 378 Md. 461, 467, 836 A.2d 627 (2003), in which the Court found that inconsistent verdicts in civil cases would not be tolerated, together with its decision in *Galloway v. State*, 371 Md. 379, 809 A.2d 653 (2002), the Court concluded:

> If the traditional reasons for tolerating inconsistent jury verdicts are not sufficient in civil cases, those reasons are clearly not sufficient in criminal cases.
>
> *          *          *
>
> [I]n criminal jury trials, out system accords greater procedural protections for the defendant than we give to either side in civil jury trials.  Consequently, if there is to be a difference, there should be less toleration of inconsistent jury verdicts in criminal cases than in civil cases.  As previously pointed out, this Court in *Galloway v. State, supra,* 371 Md. at 400, 417, 809 A.2d at 666, 676, emphasized that "the consistency

9

requirements in criminal cases" should not "be less stringent than the standards we have applied in civil cases," and that we are "unwilling to afford less protection to the jury trial rights of a criminal defendant, whose very liberty, or even his or her life, is at stake, than to a civil litigant, where, generally, it is money that is at stake." To uphold, in the present case, the inconsistent jury verdict of guilty on the count charging possession of a firearm during a drug trafficking crime, would be to repudiate the principles recently set forth in our *Galloway* opinion.

*Price v. State*, 405 Md. 10, 26-27, 949 A.2d 619 (2008).

Although the issue here is instructional error, the principles of *Price v. State* should guide this Court's decision. If it is error to accept inconsistent verdicts over defense counsel's objection, then it is surely error to instruct the jury, over defense counsel's objection, that it may return inconsistent verdicts.

An important decision on this question is *Whitaker v. United States*, 617 A.2d 499 (D.C, 1992). In that case Ms. Whitaker had been charged with three counts of assault with a deadly weapon (ADW), one count of possession of a firearm in the commission of a crime of violence (PFCV), and three misdemeanor weapon possession offenses as a result of an incident where shots were fired from the automobile in which the defendant was one of the passengers. During their deliberations, the jury informed the court that they were unable to agree on a verdict with respect to the three ADW charges, but that they had reached a verdict on the charge of possession of a firearm in a crime of violence (PFCV), as well as on the three misdemeanor weapons possession charges. Upon learning this, defense counsel asked that the jury be instructed that they could not find the

10

accused guilty of PWCV unless the accused had been convicted of one of the three ADW counts. However the judge declined the requested instruction and the jury returned verdicts on the PFCV charge and the three misdemeanor weapons charges.

In holding that the convictions must be reversed because of the judge's failure to properly instruct the jury in response to the jury note, the D.C. appellate court reasoned:

> Because of the close relationship in this case between the predicate offense (ADW) and the compound offense (PFCV), a guilty verdict as to PFCV could not be reached logically or in conformity with the evidence and the judge's instructions, unless a guilty verdict was also reached as to at least one ADW count. Similarly, the jury could not logically find Ms. Whitaker not guilty of PFCV unless she was also found not guilty of ADW. Indeed, the government does not argue to the contrary, nor has it suggested in its brief that there can be any logical reconciliation of the verdict as to PFCV and the mistrial as to the ADW counts. If the jurors were satisfied beyond a reasonable doubt that Ms. Whitaker shot at one or more of the complainants, then they were required to convict her both of ADW and of PFCV. If they entertained a reasonable doubt as to the identity of the shooter, or as to whether she shot at anyone, they were required to acquit her both of the predicate offenses and of the compound offense. Ms. Whitaker could not have committed PFCV without also having committed ADW, for ADW in the "crime of violence" which is an element of PFCV. She likewise could not be guilty of ADW without also being guilty of PFCV, because the weapon with which she allegedly assaulted the complainants was concededly a firearm, and ADW is a crime of violence. There was no logical way, under the court's instructions or as a matter of common sense, in which a juror could be undecided as to all three ADW's but nevertheless reach a verdict as to PFCV.

11

*Id.*, 617 A.2d at 501-502. The court went on to acknowledge that inconsistent verdicts are tolerated in the federal courts under *United States v. Powell*, 469 U.S. 57, 62-69, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) and *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932). Nevertheless it distinguished tolerance of inconsistent verdicts from instructions which encourage them:

> The readiness of courts to "tolerate" inconsistent jury verdicts in a criminal case, in preference to reversing a conviction after such verdicts have been rendered, *see Haynesworth v. United States*, 473 A.2d 355, 348 (D.C. 1984); *United States v. Fox*, 140 U.S.App.D.C. 129, 133 n. 21, 433 F.2d 1235, 1238 n.21 (1970), does not carry with it any proscription against taking reasonable measures to avert such inconsistency. Although jurors have the power, notwithstanding their oaths and the judge's instructions, to return verdicts contrary to their "sworn duty" to decide the case based on the law and the evidence, that power is an "anomaly in the rule of law," and its exercise should not be encouraged. *Watts v. United States*, 362 A.2d 706, 710-11 & n.5 (D.C. 1976) (en banc) (citations omitted). Toleration of a necessary evil, in other words, is not to be mistaken for the exuberant or joyful contentment with which we welcome a thing of beauty.

*          *          *

> At the time of the trial judge's ruling on which the present appeal hinges, however, no unacceptable price would have had to be paid in order to relieve jury confusion. Ms. Whitaker was not then requesting that a conviction be set aside. On the contrary, she was attempting to avoid ever having to make such a request. She asked only that the judge repeat or clarify an instruction which he had previously given. This proposed prophylactic measure was designed to avoid the prospect of verdicts incompatible with the judge's instructions and with the jurors' oaths.

*          *          *

The choice which confronted the trial judge in this case when defense counsel asked him to reinstruct the jury was therefore quite different from that of the appellate court which has been requested to set aside a verdict inconsistent with the jury's disposition of another count. If the judge in this case did nothing, illogical verdicts incompatible with his own prior instructions to the jury appeared likely to (and in fact did) become reality. If he had reinstructed, on the other hand, there was surely at least a substantial chance that, in conformity with the judge's clarified instructions, as well as their own oaths to decide the case according to the law and the evidence, the jurors would have avoided making contradictory findings. The circumstances differed from the post-verdict situation in that a reinstruction posed no appreciable risk of harm, but argued substantial potential benefit. (footnotes omitted)

617 A.2d at 503-504. Accordingly the court reversed the convictions and remanded the case for a new trial on the ADW and PFCV counts. *See also Hoffert v. State*, 319 Md. 377, 385, 572 A.2d 536 (1990) [pointing out that, "[A]n instruction directing the jury to render consistent verdicts is beneficial because it minimizes the possibility of inconsistent verdicts that result in a conviction contrary to law"].

The reasoning of *Whitaker v. United States* also applies to this case. The victim died of stab wounds, and in order for the Appellant to have committed this murder, he must necessarily have carried a deadly and dangerous weapon, either openly or concealed. If the jurors could not infer that the Appellant carried such a weapon, there was no basis for an inference that he committed the murder. While it was conceivable that the jurors could have found the Appellant guilty of a weapons offense while finding him not guilty of the murder, the reverse, which was the result in this case, was completely illogical.

13

A Maryland Court of Appeals decision which involved similarly inconsistent findings regarding the use of a weapon to commit the offense is *State v. Williams*, 397 Md. 172, 916 A.2d 294 (2007). In that case Williams had been charged with aiding and abetting Henderson and Gaines in the attempted armed robbery of the operator of a gas station. After a court trial, Williams was found guilty of attempted robbery with a dangerous weapon, first degree assault, and use of a handgun in the commission of a felony or crime of violence. However he was found not guilty of wearing, carrying or transporting a handgun, and the judge never explained the inconsistency in the verdicts. In vacating the convictions, the Court of Appeals reasoned that, "Consistent with the case law of this state, an individual must possess a handgun before he or she can use that handgun." *Id.* at 197. Reviewing the distinction between possession and use of a handgun, the Court concluded,

> Although there exists a clear distinction between possession and use, possession is a necessary component of the term "use."

> In accordance with these definitions and case law, we agree with Williams and the Court of Special Appeals, and conclude that Williams must have possessed the handgun before he could have used it. Because Williams embraced the entire criminal enterprise, it was inconsistent for the trial judge to conclude that Williams used the handgun, but did not actually or constructively possess that gun. The trial judge failed to adequately explain how Williams was not in possession of the handgun while traveling to the Citgo station with Henderson and Gaines, but, nonetheless, embraced all of the other crimes committed in furtherance of the attempted armed robbery.

14

397 Md. at 310-311.  *See also Galloway v. State, supra,* [holding that the court's verdict of possession of a firearm by a person previously convicted of a crime, in a hybrid court/jury trial, after the defendant had been acquitted by the jury of carrying or using a handgun, was inconsistent and would be reversed].

In this case it was inconsistent and illogical to find that the Appellant did not carry the weapon used to commit the crime, but that he nonetheless committed the crime.  This inconsistency could have been avoided by a proper response to the jurors' question.  However by instructing the jurors that their inconsistency was acceptable, the judge all but directed the verdict that was announced fifteen minutes later.  Because of that improper instruction, the Appellant's convictions must be reversed.

II.    **THE JUDGMENT IN THIS CASE SHOULD BE REVERSED WHERE THE VERDICTS WERE INCONSISTENT, DEFENSE COUNSEL OBJECTED TO AN INSTRUCTION CONDONING THE INCONSISTENT VERDICTS, AND THE COURT OF APPEALS DECISION IN *PRICE V. STATE* WAS ISSUED AFTER THE TRIAL, BUT WHILE THIS APPEAL WAS PENDING.**

In the *Price* decision,  the Court of Appeals departed from long-established precedent in holding that present circumstances,

> . . . fully warrant a prospective change in the common law applicable to inconsistent verdicts."  There is no longer any justification for the one remaining situation where inconsistent verdicts are tolerated, namely certain types of inconsistent verdicts by a jury in a criminal trial.  Continued acceptance of inconsistent verdicts, in that one situation, is simply not reasonable.

405 Md. at 23-24.

However the Court limited the scope of this momentous change in the law:

> Accordingly, with regard to the instant case, similarly situated cases on direct appeal <u>where the issue has been preserved</u>, and verdicts in criminal jury trials rendered after the date of our opinion in this case, inconsistent verdicts shall no longer be allowed. (emphasis supplied)

*Price, supra,* at 29.

In the present case, defense counsel did not object to the inconsistent verdicts, and the Appellant would therefore seem to be foreclosed from complaining about the inconsistency on direct appeal. However in *Hays v. State,* 240 Md. 482, 214 A.2d 573 (1965), the Court of Appeals recognized an exception to the general rule precluding appellate consideration of an issue that was not raised in the trial below. In that case, the defendants had been convicted of larceny and receiving stolen goods in the Baltimore County Circuit Court on December 4, 1964. Then, while their appeal was pending, the Court of Appeals decided in *Schowgurow v. State,* 240 Md. 121, 213 A.2d 475 (1965) that a provision of the Maryland Declaration of Rights requiring a religious oath as a qualification for jury service, was invalid. Hays' appellate counsel urged the appellate court to reverse Hays' convictions on that ground even though he had not made that argument in the trial court. In granting that relief, the Court of Appeals reasoned:

> In a long line of cases, we have held that, under this Rule and its predecessors, a defendant in a criminal prosecution

16

cannot raise for the first time on appeal an objection which was available to him at the trial and which he did not raise below. . . . *Tucker v. State*, 237 Md. 422, 425, 206 A.2d 691 (1965); *Capparella v. State*, 235 Md. 204, 209, 201 A.2d 362 (1964) and cases therein cited.    It is also the law of this state, however, that if a change in the law after conviction but before final judgment, including the final judgment of the highest court empowered to review the conviction, requires reversal of the judgment, the judgment will be reversed, because the decision must accord with the law as it is at the time of final judgment. . . .

                    *          *          *

In this case, as we pointed out in *Schowgurow*, the law in effect at the time of the selection of the grand jury had been part of the Maryland constitution for over a century.  That law was changed by this Court, because of the reversal of our decision by the Supreme Court in *Torasco v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).  The change in the law took place after the appellants had been indicted and convicted, pending their appeal. If the appellants had objected to the method of selection of the grand jury which indicted them before their trial or at any time in the proceedings below, that objection would have been rejected by the lower court, there then being no decision of this Court to the contrary. Unlike the failure to object in the cases which have been cited under Rule 885, the appellants' failure to object was not a waiver of an existing right.

*Id.* at 485-486.  *See also Franklin v. State*, 319 Md. 116, 571 A.2d 1208 (1990) [finding plain error in trial court's instruction that the State was not required to prove a specific intent to kill in prosecution for assault with intent to murder, where case establishing that this intent was a required element of the crime had not been decided at the time of Franklin's trial]; *Squire v. State*, 280 Md. 132, 358 A.2d 1019 (1977) [finding plain error in self defense instruction which placed burden of proof on defendant where decision in *Mullaney v.* Wilbur, 421 U.S. 684,

17

95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) was issued only four days before Squire's trial and the instruction given at that time was in accord with the established law of this State].

Similarly at the time of the Appellant's trial, it had long been the established law of this jurisdiction that a jury could return inconsistent verdicts. Therefore, as in *Hays*, there would have been no possibility that counsel could have prevailed if he had objected to them, "there being no decision of this court to the contrary." *Hays* at 286. Furthermore when defense counsel attempted to forestall the inconsistent verdict by opposing the judge's response to the jury question, the judge overruled his objection. Therefore, after informing the jury that it could return inconsistent verdicts, the judge would not have been inclined, upon defense counsel's objection, to return the case to the jury after the verdicts were rendered, with an instruction that it could <u>not</u> return inconsistent verdicts.

In light of the special circumstances of this case, where counsel cannot be faulted for failing to object to the verdicts, this Court should vacate the judgment, Maryland Rule 8-131 notwithstanding.

**III.  THE TRIAL COURT ERRED IN ADMITTING AS SUBSTANTIVE EVIDENCE PRIOR STATEMENTS OF A CRITICAL STATE'S WITNESS WHICH DID NOT, IN SUBSTANCE, CONTRADICT THE WITNESS'S TRIAL TESTIMONY.**

The testimony of Tony Alexander was central to the State's case against the Appellant.  It was Tony Alexander who was a witness to the acrimonious exchanges that allegedly took place between the Appellant and L.T., and it was

18

Alexander who drove the Appellant to his grandmother's house before the encounter between the two men at the corner of Fayette and Catherine Streets. Alexander also testified that he had seen the Appellant chase L.T. into an alley and that he had seen the Appellant emerge from this alley seconds later at approximately the time when L.T. was stabbed.   Even though all of these incriminating facts came out in the course of Alexander's testimony, the State was nonetheless displeased with his description of events, and repeatedly attempted to "refresh his recollection, " both with a statement that Alexander had previously given to Detective Ritz on April 26, 2002, and with the testimony that he had given at the Appellant's prior trial in April, 2003.[5]   However the State's direct examination of Alexander did not reveal any major inconsistencies between his testimony on the stand and those prior statements.

For example when questioned about the initial encounter between the two men, Alexander testified as follows:

> Q. [Prosecutor]  Now, you said that this individual, LT, was arguing.  Can you be more specific about what you saw or what you heard?
>
> A.  I heard him cussing and fussing.
>
> Q.  Did you see who he was arguing with?
>
> A.  He was arguing with Coop.
>
> Q.  With who?
>
> A.  Coop.

---

[5] See Footnote #1.

Q.  The Defendant?

A.  Yes.

Q.  Could you hear what either of them was saying?

A.  Not really.

Q.  Well, do you recall giving a taped interview to Detective William Ritz on April 26, 2002?

A.  Yes.

Q.  And do you recall telling Detective Ritz what was said during this argument?

A.  Well, LT basically (unclear).  What the fuck you going to do?

Q.  Let me show you State's Exhibit No. 7 and direct your attention specifically to Page (unclear).  I would ask you to read this to yourself (unclear) Detective Ritz question and your response to that question.

A.  Okay, so you --

Q.  No, to yourself.

A.  Yes.

Q.  Mr. Alexander, does that refresh your recollection as to what was said during that argument (unclear) and the Defendant?

A.  Yes.

Q.  What does Mr. Scott, or LT, say?

A.  Basically (unclear) what you going to do?

Q.  And what did Mr. Cooper say in response?

A.  What you talking about?  (unclear) with that stuff. [T2: 159-161]

20

The prosecutor also confronted Alexander with his testimony at the prior trial. When questioning him about the length of time when the Appellant was out of sight after chasing L.T. into the alley, the prosecutor inquired as follows:

BY MS MARTIN:

Q.   Were you concerned about Mr. Cooper's safety when he went into the alley, Mr. Alexander?

A.   (Unclear) at that time I didn't know what was going to happen, so I was (unclear).

Q.   And what happened as you pulled off?

A.   (Unclear) he came from behind the building.

Q.   And you said that it was as soon as.  Do you recall testifying earlier that it was between five and ten seconds?

A.   (No audible response)

Q.   Do you recall how far you had driven when you saw the Defendant come out of the alley?

A.   Five or ten feet.

Q.   Were you driving -- did you floor it or were you driving slowly?

A.   I was driving slow.  As soon as I put my foot on the gas, he was coming out.

THE COURT:  Mr. Alexander, when you say coming out, what do you mean by coming out?

THE WITNESS:  Well, I don't know how far he went into the alleyway.  When I seen him turn the corner, behind 2500 Block, that's when I started to pull off.  When I started to pull off, that's when he came from behind the house.

BY MS. MARTIN:

21

Q.   And when you say behind the house, you are referring to the back of the house where the alley is, is that right?

A.   Right.

Q.   So, he's coming out of the alley?

A.   Right.

Q.   After you had driven five to ten feet?

A.   Right.

Q.   And how long was Mr. Cooper before he returned to your car?

A.   I would say the whole thing, from his running from the car to the alley and back, I would say about 15 seconds.

Q.   Do you recall testifying previously that it was 15 to 20 seconds?  [T2: 178-179]

The prosecutor again confronted Alexander with the testimony he had given at the prior trial when she asked him why he had not contacted the police after learning that Elliott Scott had been stabbed.

Q. [Prosecutor]   When you found out that Mr. Scott had been stabbed and killed, at about the same time the Defendant chased him into the alley, did you contact the police?

A.   No.

Q.   Why not?

·A.   Because I (unclear).

Q.   Well, did you -- you didn't contact the police to tell them that the Defendant, Brian Cooper, had chased him into the alley?

MR. MURPHY:  Objection.

THE COURT:  Sustained.

22

Q.   Did you tell the police, or contact the police, and tell them that Mr. Cooper had chased him into the alley?

MR. MURPHY: Objection.

THE COURT: Sustained.

Q.   Did you previously testify that the reason you didn't contact the police was because you didn't want to get involved?

A.   (Unclear)  if I said that.

Q.   Let me direct your attention to State's No. 11, page 215.

*          *          *

BY MS. MARTIN:

Q.   Mr. Alexander, directing your attention to the bottom of Page 215.

A.   (Unclear.)

Q.   Mr. Alexander, does that refresh you recollection as to the reason why you didn't contact the police when you learned that Mr. Scott had been stabbed?

A.   Yes.

Q.   Why was that?

A.   (Unclear.)

Q.   Why didn't you contact police when you found out that the Defendant had been stabbed shortly after the Defendant had chased him into the alley?

A.   Because I didn't want to get involved.

Q.   And do you also recall testifying that the reason you didn't call the police was because the Defendant was -- and I'm quoting you words -- "cool with you"?

MR. MURPHY:  Objection.

23

THE COURT:  Overruled.

A.  I don't recall saying that.

Q.  I'm sorry?

A.  (Unclear)  when I said it.

Q.  Let me direct you attention to Page 216.  Does that refresh your recollection, Mr. Alexander?

A.  (Unclear.)

THE COURT:  I'm sorry, Mr. Alexander, I can't hear you.

A.  I said -- when they asked me questions, I said cool with me (unclear).

Q.  Well, the question is, did you testify in another proceeding that the reason why you didn't immediately contact the police was because the Defendant was -- and I quote -- "cool with you".  And your response, "and I always said he didn't do it either.  I didn't think he didn't do it."

So, is that --

A.  I don't remember anybody asking me (unclear) it or not. [T2: 186-189]

The attack directed towards Mr. Alexander by the prosecutor eventually became so intense that the judge asked the prosecutor if she would like to have him declared a hostile witness. The prosecutor replied that she would like "some leeway" in questioning, alleging that the witness "certainly is being somewhat uncooperative in responding to the State's questions." [T2: 224]  However defense counsel disputed this characterization of the witness's testimony:

MR. MURPHY:  I don't think he's being uncooperative.  I think he's answering every question from me and from her.  He's a State's witness.  Just because it's not the answer she wants doesn't mean he's being uncooperative. [T2: 224]

24

Nevertheless the judge continued to allow the prosecutor to "refresh the witness's recollection" with prior statements that the prosecutor viewed as more favorable to the State, and ultimately allowed selected parts of both the witness's prior testimony at the first trial and the statement he gave to Detective Ritz to be introduced as substantive evidence. [T3: 174-175] These exhibits were submitted to the jury with the following instruction:

> Now, you have heard testimony that several witnesses made statements before trial or at another hearing. Testimony concerning those statements was permitted only to help you decide whether to believe the testimony that the witness gave during this trial. It is for you to decide whether to believe the trial testimony of any one of those witnesses, in whole or in part, but you may not use the earlier statement for any purpose other than to assist you in making that decision.
>
> There are two exceptions to this instruction that I have just given you. State's Exhibit 7A and 11A. These Exhibits have been introduced as substantive evidence. You may consider these statements, that is 7A and 11A, for the truth of the matter asserted therein and/or for impeachment purposes. (emphasis supplied) [T3: 182]

Maryland Rule 5-802.1 was never intended to be used for the introduction of a witness's prior statements under the circumstances presented in this case. Under the language of that Rule,

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> (a)   A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition;  (2) reduced to writing and was signed by the

declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement;

This Rule was not intended to supplant the proper procedures for impeaching a witness's testimony with inconsistencies of the nature set forth above, nor was it designed as a substitute for refreshing a witness's recollection. It was intended to address the problem of the "turncoat witness" whose testimony at trial is so inconsistent with the witness's prior statements incriminating the accused that the inconsistency undermines the State's case.

For example in *Nance and Hardy v. State*, 331 Md. 549, 629 A.2d 633 (1993), the decision which spawned the Rule, the three witnesses for the State had completely repudiated their identifications of the defendants and denied that they had made pre-trial statements implicating them in a shooting. Quoting from C. McCormack, *The Turncoat Witness, Previous Statements as Substantive Evidence*, 25 Tex. L. Rev. 573, 577 (1947), the Court of Appeals held that such pre-trial statements were admissible because,

> "[T]he witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. It will go hard, but the two questioners will lay bare the sources of the change in face, in forgetfulness, carelessness, pity, terror or greed, and thus reveal which is the true story and which the false. It is hard to escape the view that evidence of a previous inconsistent statement, when the declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony."

331 Md. at 565.

The Court went on to explain that "[i]nconsistency includes both positive contradictions and claimed lapses of memory". . . and that when a witness's claim of lack of memory amounts to a deliberate evasion, inconsistency is implied." 331 Md. at 564, FN5.  However a genuine inability to recall events is not deemed an "inconsistency," and the Rule is not applicable.  *Corbett v. State*, 130 Md. App. 408, 746 A.2d 954 (2000) [holding that judge's failure to determine whether witness's inability to recall the facts of the alleged sexual abuse was real or feigned required that the convictions be reversed].  *Compare Makell v. State*, 104 Md. App. 334, 656 A.2d 348 (1995) [holding that Rule applied even though witness claimed a total memory loss].

A witness's complete refusal to testify, however, is not considered an "inconsistency" justifying application of the Rule.  *Tyler v. State*, 342 Md. 766, 679 A.2d 1127 (1996)  Furthermore where, as in the present case, there are two prior statements which are offered under Rule 5-802.1, each statement must be compared with the trial testimony for purposes of determining admissibility.

> What is initially required by *Nance* is that the out-of-court declarations of a witness be *inconsistent* with the witness's trial testimony.  If there are more than one out-of-court declarations, consistency or inconsistency between or among them is inconsequential.  For purposes of admissibility, they are to be measured against the trial testimony, not against each other. (emphasis in original)

A review of State's Exhibits 7A and 11A reveal that there were no significant inconsistencies between Alexander's testimony and the prior statement he gave to Detective Ritz or his testimony at the prior trial.  The inconsistencies

brought out by the State on direct examination were minor, and the witness's inability to recall the critical events in precise detail is understandable in a trial that is taking place four years later. Such minor inconsistencies in a witness's testimony cannot justify the wholesale admission under Rule 5-802.1 of prior statements which might be viewed as more favorable to the State's case. In order for a prior statement to be admitted under this hearsay exception, the inconsistency must go to the heart of the State's case. Otherwise the exception would swallow the Hearsay Rule.

In the present case, the prosecutor's examination of Tony Alexander suggested that Alexander had a bias in favor of the Appellant and was reluctant to tell all that he knew. However there was no information in the prior statements that substantially varied from the testimony he gave during the trial. The trial court erred in admitting those prior statements as substantive evidence under Maryland Rule 5-802.1.

## IV.   IT WAS ERROR TO REFUSE TO ADMIT THE PRIOR STATEMENTS IN THEIR ENTIRETY UNDER THE "DOCTRINE OF VERBAL COMPLETENESS."

Although trial counsel disagreed with the judge's decision to admit the witness's prior statements as substantive evidence, he argued that at the very least those statements should be admitted in their entirety so that the jurors "can evaluate the context of these out of context questions and answers." [T3: 138] The judge then asked for specific instances when the use of the entire statement would clarify the witness's meaning. However defense counsel maintained that

the jurors could not decide whether to believe the witness's trial testimony or the prior statements without knowing how often one varied from the other.   He pointed out that "rather than give the State [the opportunity to] cherry pick pieces of that statement, . . it gives the jury the ability to assess everything in context. . ." [T3: 141]  Nevertheless defense counsel's request was denied, and only redacted versions of the witness's statement and the prior testimony came into evidence. [T3: 175]

The doctrine of verbal completeness originates in the common law. According to the description of this doctrine in *Conyers v. State*, 345 Md. 525, 693 A.2d 781 (1997) [quoting from *Feigley v. Balto. Transit Co.*, 211 Md. 1, 124 A.2d 822 (1940)],

> The doctrine allows a party to respond to the admission, by an opponent, of part of a writing or conversation, by admitting the remainder of that writing or conversation. *Richardson v. State*, 324 Md. 611, 598 A.2d 180 (1991).  The requirements of the doctrine of completeness were first set forth by this Court in *Feigely v. Balto. Transit Co.*:
>
> > " ' This right of the opponent to put in the remainder is universally conceded, for every kind of utterance without distinction; and the only question can be as to the scope and limits of the right.
> >
> > * * * In the definition of the limits of this right, there may be noted three general corollaries of the principle on which the right rests, namely:
> >
> > > (a)   No utterance irrelevant to the issue is receivable;

(b)     No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable;

(c)     The remainder thus received merely aids in the construction of the utterance as a whole, and is not in itself testimony.' "

211 Md. 1, 10, 124 A.2d 822, 827 (1956 (quoting 7 Wigmore, EVIDENCE, sec. 2113 (1940)).  The doctrine is further limited in that the remainder of a writing or conversation sought to be introduced must not be irrelevant and should be excluded if "the danger of prejudice outweighs the explanatory." *Richardson*, 324 Md. at 622-23, 598 A.2d at 185 (quoting MCCORMICK ON EVIDENCE, sec. 56 (E. Cleary ed., 3d ed. 1984)).

*Conyers, supra*, at 541-42. *See also Churchfield v. State*, 137 Md. App. 668, 774 A.2d 409 (2001); *Case v. State*, 118 Md. App. 279, 702 A.2d 177 (1997); *Holmes v. State*, 116 Md. App. 546, 698 A.2d 1139 (1997).

This common law rule has been "partially codified, at least as to timing, in Maryland Rule 5-106." *Conyers, supra*, at 540-541.  *See also Rutherford v. State*, 160 Md. App. 311, 320, FN2, 863 A.2d 1031 (2004).  That Rule provides,

When part or all of a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

In this case, the State repeatedly attacked the credibility of its own witness, Tony Alexander, during his direct examination and implied that his testimony differed significantly from previous statements he had made regarding the events

in question.  Those prior statements, according to the State, were more probative of the Appellant's guilt.

However it was the position of defense counsel that there were no major inconsistencies between the Appellant's testimony and his prior statements and that any minor inconsistencies were greatly outweighed by the similarities. Therefore it was important for the jurors to see those prior statements in their entirety, so that they could compare them with Alexander's trial testimony and determine for themselves whether Alexander's trial testimony was credible. Because the jury was likely misled by the redacted statements, the judge should have granted defense counsel's request, and the resulting prejudice entitles the Appellant to a reversal.

## V.    A SUSPECT'S FAILURE TO TURN HIMSELF IN TO THE POLICE IS NOT ADMISSIBLE AS CONSCIOUSNESS OF GUILT.

During direct examination of Tony Alexander, the prosecutor inquired about a discussion he might have had with the Appellant regarding Scott's murder, and defense counsel objected.

> THE COURT:  Ms. Martin, can you proffer for me what the witness is going to say?
>
> MS MARTIN:  He indicated that --
>
> THE COURT: He being the witness?
>
> MS. MARTIN:  The witness.  He indicated that he had a conversation with the defendant in which the Defendant indicated he knew that he was a suspect in the killing.

31

THE COURT: What's the relevance?

MS. MARTIN: I think the relevance will be tied up. That this conversation occurred before he spoke with Detective Ritz on April 26th.

THE COURT: He being?

MS. MARTIN:   Before Mr. Alexander spoke with Detective Ritz on April 26th, and that the Defendant indicated that he knew he was a suspect but that he didn't contact the police either, until he was arrested on May 16th.  I think it goes to establish consciousness of guilt.

THE COURT: Mr. Murphy?

MR. MURPHY: I don't know whether he said this before at the previous trial or in anything I ever got. I've never heard this.   But, that aside, there is no relevance to a criminal defendant not turning himself in to the police. There is not(sic) duty to (unclear) yourself to justice.  (Unclear) the right to remain silent and the right to do nothing.  The fact that he didn't turn himself in is not only not relevant, it's highly prejudicial.

THE COURT: I am going to overrule the objection. [T2: 190-191] (emphasis supplied)

The prosecutor was then permitted to adduce testimony from Alexander that he told the Appellant that he was a suspect in the killing, and that the Appellant told Alexander that he was aware of that. [T2: 192-193]

It was error for the trial court to admit this testimony as evidence of consciousness of guilt.  In *United States v. Foutz*, 540 F.2d 733 (4th Cir. 1976), the Fourth Circuit reviewed this issue, although it reversed on other grounds, and concluded that such evidence should not be admitted on retrial.   Foutz had engaged in a phone conversation with a police officer on March 15th, in which the

32

police officer informed him that he was wanted for bank robberies in the area. Nevertheless Foutz did not surrender himself to the police and was arrested a week later. Pointing out that during this period Foutz had not left town, the court observed,

> The inference that one who flees from the law is motivated by consciousness of guilt is weak at best, and the district court properly recognized that the strength of the inference is further attenuated when the defendant has not actively sought to avoid capture.

*Id.* at 739-740. *Compare United States v. Beahm*, 664 F.2d 414 (4th Cir. 1981).

The Appellant, like Foutz, was aware that he was a suspect in Scott's murder, but there was no evidence that he actively attempted to avoid arrest for that crime. Furthermore a suspect has no obligation to turn himself in to the police unless a warrant has issued for his arrest. In fact, imposing such an obligation may violate a suspect's Fifth Amendment rights. *See United States v. Thompson*, 82 F.3d 849, 855-856 (9th cir. 1996). Because the evidence at issue here was irrelevant and most likely unconstitutional as well, the Appellant's conviction must be reversed.

## CONCLUSION

For the foregoing reasons, Appellant requests that the judgment of the court below be reversed.

Respectfully submitted,

Nancy S. Forster
   Public Defender

Martha Weisheit
   Assistant Public Defender

Counsel for Appellant

Font: Times New Roman 13

34